# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

ASA S. FOREMAN, )
              Plaintiff, )
  )
vs. )
  )          Case No. 18-CV-71-RAW
TERESA DELORIS ELAM, LPN, )
Jess Dunn Correctional Center )
and in her individual capacity; )
  )
ROBERT RICHARD EDDE, M.D. )
Jess Dunn Correctional Center )
and in his individual capacity; )
  )
MICHELLE LEHNUS, )
Medical Services Administrator )
Jess Dunn Correctional Center )
and in her individual capacity; )
  )
ROBERT CORNEL BALOGH, M.D., )
Joseph Harp Correctional Center and )
in his individual capacity; )
  )
JOEL BRENT MCCURDY, M.D., )
Director of Medical Services for the )
Oklahoma Department of Corrections )
and in his individual capacity; )
  )
HEATHER HASENMEYER, )
Physician assistant at Jess Dunn )
Correctional Center, in her individual )
capacity; )
  )          JURY TRIAL DEMAND
J. MARLAR, M.D. )
and in his individual capacity; )          ATTORNEY LIEN CLAIMED
  )
JONNA PERRY, )
a case manager at Jackie Brannon )
Correctional Center; and )
in her individual capacity; )
  )
SGT. DAVID SUMMERS, )
and in his individual capacity, )
              Defendants. )

1

<u>**CIVIL RIGHTS COMPLAINT PURSUANT TO 42 U.S.C. § 1983**</u>

COMES NOW the Plaintiff, Asa S. Plaintiff, ODOC # 378327, a State prisoner, by and through his attorney of record, Debra K. Hampton, and submits a Civil Rights Complaint against the above-named Defendants.  The Plaintiff alleges and states as follows:

## I.      JURISDICTION AND VENUE

**A.**      The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343(a)(3) to secure protection to redress deprivations of rights secured by the Eighth Amendment and Fourteenth Amendment to the United States Constitution. Section 1983 provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

**B.**      The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

**C.**      The Plaintiff also invokes supplemental jurisdiction over state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case and controversy arising under the United States Constitution and federal law.

**D.**      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## PREVIOUS FEDERAL CIVIL ACTIONS OR APPEALS

The Plaintiff has not previously filed any other actions in Federal Court for a Civil Rights Complaint under § 1983.  The Plaintiff has been a State prisoner in the custody of the Oklahoma Department of Corrections since the year of 2000.

## II.    THE PARTIES TO THIS COMPLAINT:

A.    The Plaintiff, Asa S. Plaintiff, ODOC # 378327, is a state prisoner, who currently resides at the Jackie Brannon Correctional Center, P.O. Box 1999 McAlester, OK 74502-1999.

B.    **The Defendants**

1.    Teresa Elam, a DOC Nurse and in her individual capacity;

This defendant is a nurse at the Jess Dunn Correctional Center in Muskogee County, 601 South 124th Street West, P.O. Box 316, Taft, OK 74463-0316, and was working under color of State law at the times the allegations arose.

2.    Richard Edde, a DOC physician, and in his individual capacity;

This defendant is a physician at the Jess Dunn Correctional Center in Muskogee County, 601 South 124th Street West, P.O. Box 316, Taft, OK 74463-0316, and was working under color of State law at the times the allegations arose.

3.    Michelle Lehnus, a DOC Medical Services Administrator, and in her individual capacity;

This defendant is a Medical Services Administrator with the Oklahoma Department of Corrections at the Jess Dunn Correctional Center in Muskogee County, 601 South 124th Street West, P.O. Box 316, Taft, OK 74463-0316, and was working under color of State law at the times the allegations arose.

4.    Robert Balogh, a DOC physician, and in his individual capacity;

This defendant is a physician at the Joseph Harp Correctional Center, JHCC P.O. Box 548, Lexington, OK 73051-0548, and was working under color of State law at the times the allegations arose.

5.    Joel B. McCurdy, M.D. a DOC physician, and in his individual capacity;

This defendant is a physician and the Director of Medical Services for the Oklahoma Department of Corrections, 2901 N. Classen Blvd, Oklahoma City, Oklahoma, and was working under color of State law at the times the allegations arose.

6.    Heather Hasenmeyer, a Physician Assistant at Jess Dunn Correctional Center at the time the allegations arose and in her individual capacity.

3

This defendant is an employee with the Oklahoma Department of Corrections at the Jess Dunn Correctional Center in Muskogee County, 601 South 124th Street West, P.O. Box 316, Taft, OK 74463-0316 (405) 213-9764, and was working under color of State law at the times the allegations arose.

7.     J. Marlar, a DOC physician, and in his individual capacity,

This defendant is a physician at OSP that serves the Jackie Brannon Correctional Center, in McAlester, Oklahoma, and was working under color of State law at the times the allegations arose.

8.     Jonna Perry, a DOC Case Manager, and in her individual capacity,

This defendant is a case manager at the Jackie Brannon Correctional Center, in McAlester, Oklahoma, and was working under color of State law at the times the allegations arose.

9.     Sgt. David Summers, a DOC Officer, and in his individual capacity,

This defendant is an officer at OSP that had interactions with the Plaintiff at the Jackie Brannon Correctional Center, a support unit for OSP, in McAlester, Oklahoma, and was working color of State law at the times the allegations arose.

C.     **Jess Dunn Correction Center (JDCC) Defendants**

**Teresa Elam**, LPN., and in her individual capacity;
**Richard Edde**, M.D., and in his individual capacity;
**Michelle Lehnus**, a DOC Medical Services Administrator, and in her individual capacity;
**Heather Hasenmeyer**, a physician assistant, and in her individual capacity.

1.     On April 27, 2016 the Plaintiff went to the medical unit at approximately 6:45 a.m. at the Jess Dunn Correction Center (JDCC). The Plaintiff was presenting symptoms of a stroke[1] to Defendant, Teresa Elam[2], and the Plaintiff indicated to her that he thought he had a stroke. Defendant Elam instructed the Plaintiff that she did not believe he had a stroke and to go lay

---

[1] Numbness on left side, slurred speech, having problems with balance.
[2] ELAM, TERESA DELORIS     LPN, SSL*     Active   42943   08/05/1999     Expires 04/30/2019

4

down until 8:30 a.m. when the doctor arrived. The Plaintiff did as he was instructed and went back to his bunk and laid down. While he was laying in his bunk, he had another stroke.  On this same date, the Plaintiff was seen by Defendant, Dr. Richard Edde, which instructed the Plaintiff that "***if you are trying to run a scam on me you are doing a good job.***"  The Plaintiff was transported to the Lindsay Memorial Hospital. The Plaintiff was then referred to OU Medical Center in Oklahoma City. A John Doe, transportation officer/staff member informed the Plaintiff that Defendant Edde had not given his approval for a trip to OU, after he had been informed that the trip was needed.

2.    The next day, on April 28, 2016, Heather Hansmeyer, a Physician Assistant at Jess Dunn, started the Plaintiff on aspirin and this was after the fact that the Plaintiff had already experienced a stroke. This is a deliberate indifference as aspirin should have never been administered at this time, increasing the odds for more complications.

3.    On April 29, 2016, at approximately 6:30 p.m. the Plaintiff experienced yet another stroke and aneurysm. The Plaintiff was on the aspirin at this time which contributed to the aneurysm and further strokes. At this time the Plaintiff was transported to the Emergency Room at the Muskogee Regional Medical Center and then transported to St. Johns Medical Center in Tulsa, Oklahoma. The Plaintiff was placed in ICU for approximately 4 days. The Plaintiff was then transferred to Joseph Harp Correctional Center (JHCC) for his medical needs. This medical neglect could have resulted in death.

5

4.      Defendant Edde recognized that the Plaintiff needed treatment, sent the Plaintiff to Lindsay Hospital and then abandoned the medical findings of the treating physicians at Lindsay Hospital. This is clear and convincing evidence of a ***deliberate indifference, and medical incompetence*** rising to the level of an Eighth Amendment violation.

5.      Defendant, Michelle Lehnus is named in connection with this facility as she was responsible for answering a Request to Staff (RTS) forms sent to Defendant Edde and Defendant Elam. ODOC policy does not permit another employee to respond for another employee, Lehnus violated procedural due process. Thus, Defendant Lehnus meets sinter requirements of due process violations under the Fourteenth Amendment of the United States Constitution. The Plaintiff only grieved one incident in the RTS, but also asked Defendant Elam if her training consisted of being instructed that inmates are liars. This seems to be a common scheme within the ODOC. The Plaintiff discusses a set of facts below that reinforces his claims of a deliberate indifference concerning this facility starting in a chronological order involving the Plaintiff's feet leading up to the strokes. This also gives a prima facie showing that the Plaintiff has exhausted all administrative remedies.

D.      **Jess Dunn Correctional Center (JDCC)**

6.      The Plaintiff has extraordinarily wide feet and was suffering from repeated ingrown toenails. Defendant Edde removed Plaintiff's toenail on eight (8) occasions when it was evident that the cause of the toenail becoming

ingrown was his shoes. The Defendant Edde eventually ordered the Plaintiff to get special shoes, and this was before the strokes. The facility never did get the shoes that was ordered by medical. It was not until after the Plaintiff had been transferred to Joseph Harp Correctional Center did he get the shoes that he needed. The issue with the toenail displays a deliberate indifference, *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and amounts to cruel and unusual punishment under the Eighth Amendment. The failure to treat the circumstances which lead to the toenail becoming ingrown is the violation of the Eighth Amendment as the removal of the toenail was very painful and caused the area to become infected. There is a reasonable probability that this infection contributed to the stroke with the timing of events. The Plaintiff demonstrates the factual basis and the exhaustion of his remedies.

### *Foot & Appropriate Shoe Issues*

**(1)**   11/11/2015   Plaintiff completed RTS 138106-7

**(2)**   12/01/2015   Michelle Lehnus stated to submit this request on a sick call.

**(3)**   12/02/2015   Surgery on Toenail

**(4)**   12/10/2015   9:45 a.m.   Dr. Ellis contacted Michelle Lehnus indicating her concerns regarding Plaintiff's post-surgery care. Dr. Ellis was shocked that such a procedure was performed and no pain medication or antibiotic being provided to Plaintiff. A formal request was submitted on 12/08/2015 for pain medication and antibiotic to prevent infection. He had a moderate blister on his right toe.  Issues:

    **a)**   Pain

    **b)**   Infection & Swelling

    **c)**   Footwear

**d)**   Ms. Lehnus indicated there is no note about infection or swelling in system.

**e)**   Dr. Ellis indicated that she has spoken to several staff since his procedure and nothing has been done regarding his pain nor has anything been provided to keep the wound clean and free from infection.

**f)**   Ms. Lehnus stated that footwear must be requested by the doctor. No record in his file states he needs a specialized shoe. Plaintiff can order shoes from canteen.

**g)**   Dr. Ellis indicated how his special footwear from Dick Conner disappeared, as they were ordering special footwear at his previous institution. Dr. McCurdy was aware of the situation but somehow DOC believes this is a nonissue since his transfer. Furthermore, 8 procedures to remove an ingrown toenail is excessive and civilians in the world would question the medical integrity of a podiatrist who is unable to stop an ingrown toe nail.

**h)**   Ms. Lehnus indicated that there is no record of it being excessive, which clearly demonstrates medical incompetence by the State employees.

**(5)**   12/11/2015   11:19 am   Dr. Ellis contacted medical to follow-up on right toe. Michelle is not in today. Sonya Odell checked for the release form. After confirmed, she indicated that there were no concerns documented. He had a follow-up today.

**(6)**   12/11/2015   Dr. Ellis contacted Dr. McCurdy (405) 962-6155 and left message stating her concern in regard to procedure on 12/02/2015. Defendant Edde prescribed topical cream and 800 mg of pain medication and he has not received it. Moreover, Plaintiff's medical notes do not indicate any concern in regard to pain elevation causing BP to rise and infection, swelling, and blistering his family has witnessed on his toe.

**(7)**   12/14/2015   12:56pm   Dr. Ellis contacted medical and indicated the nail is covered in black blood and Plaintiff and I were told if this occurred he need to come to medical. He has pain and numbness on right toe and there is a visible blister that his family is concerned about. They indicated they would check into it and call me back. At 2:10pm Parsons from medical called back and indicated there was no sick slip submitted per their policy. It is not considered medically necessary and the blister is a separate issue from the surgery. Dr. Ellis asked if Plaintiff saw a physician that came to that conclusion or was it medical support staff's opinion. If the physician prescribed pain medication and antibiotic and told Plaintiff to go to medical

if he had black blood or signs of infection, would that not deem it medically necessary?  How is the blister a separate issue? Removing a toe nail is a basic procedure that carelessness and medical incompetence can cause infection or worse loss of the toe due to medical neglect.

**(8)**   12/14/15    Plaintiff completed a Request for Health Services. Teresa Eallum threatened to lock up Plaintiff for lingering at medical; Plaintiff told Unit Manager Jerry Grisby that he was told to report to medical if nail turned black or it became infected with puss; Grisby agreed for Plaintiff to go to medical then changed his mind and said he was no doctor. Plaintiff was experiencing numbness, pain, and toe was swelling.

**(9)**   12/17/15    8:30am    Dr. Ellis requested to speak with Michelle Lehnus and Theresa Eallum/Bolinger indicated that Michelle will be back around 9:30am. Dr. Ellis left name and contact information.

**(10)**   12/17/15    Michelle called back at 9:22am to tell me she could not guarantee me Plaintiff would be seen by a doctor.  Dr. Ellis indicated to her that it had been over 2 weeks since the procedure and they still have not provided relief. Dr. Ellis reminded her that last Thursday after a no show on Wednesday, she told me he would be seen by the doctor on Tuesday and so did the nurse last Friday.  Michelle indicated that she could have misread it.

**(11)**   12/18/15    10am  Dr. Ellis contacted Dr. McCurdy on his cell phone. After introducing herself, he asked where she got his phone number. Dr. Ellis mentioned that she has contacted his office on numerous occasions and his secretary gave her the number to reach him in regard to her medical concerns about Plaintiff.  Dr. Ellis indicated concerns:

**a)**   No Rx for pain medication or infection.

**b)**   No cleaning materials to care for wound since procedure.

**c)**   Approved special footwear at DCCC and Rx mysteriously disappear when transferred to JDCC.

**d)**   Eight procedures on one toe is excessive and would be frowned upon in civilian medical practice displaying a deliberate indifference.

**e)**   He has completed all the forms to request the items discussed and still has not received any relief.

**f)**   Blood pressure has elevated.

**g)**   No lay in provided for 72 hours as indicated.

9

      **h)**     No antibiotic for exposed toe in a dirty environment and no wound care.

      **i)**     No open toe shoe provided to avoid pressure or material rubbing wound.

**(12)**    02/26/2016    Plaintiff completed offender grievance form per the request of Michelle Lehnus because he had not seen a doctor to date, more than two months after procedure.

**(13)**    03/08/2016    Art Lightle requested him to submit the grievance to Michelle Lehnus, the Medical Administrator.

**(14)**    03/09/2016    Plaintiff completed offender grievance form to Michelle Lehnus instead of Art Lightle.

**(15)**    04/08/2016    Plaintiff submitted an offender grievance to Michelle Lehnus for special footwear.

**(16)**    04/18/2016    Grievance #JDMG-16-01 received on 04/13/16 but was denied due to grievance being submitted out of time from date of incident or date of response to the RTS.

**(17)**    04/22/2016    Request to Staff submitted to Michelle Lehnus for special footwear

**(18)**    05/05/2016    Michelle responded stating no disposition; affirmation box at top of form not fully completed.

**7.**    The infection that manifested in the toe gives an irrebuttable presumption that is what facilitated and contributed to the Plaintiff's strokes. The date range from the issues with the toenail and leading up to the strokes show a deliberate indifference to his medical needs. This wanton negligence or "deliberate indifference" is governed by *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

      **E.**    **Strokes**

**(1)**    04/27/2016    Plaintiff contacted Dr. Ellis. During the conversation, Plaintiff was talking and all suddenly his speech was so slurred she was unable to understand him.  Dr. Ellis asked him what was wrong.  Are you having a stroke? Plaintiff said he hoped not. Dr. Ellis directed him to hang

up the phone and go directly to medical because she thinks he is having a stroke. (Dr. Ellis can testify to this phone conversation)

**(2)**    04/28/2016-05/10/2016       time frame of aspirin given to Plaintiff that could have killed him due to documented health issues. Prescribed by Heather Hansmeyer, a Physician Assistant.

**(3)**    *(Plaintiff's statement)* 04/27/2017    6:45am       Plaintiff walked to medical at JDCC and reported to nurse Teresa Ealum that he was having a stroke.  She asked him how do you know that and Plaintiff explained from reading books and watching TV.  He told her his symptoms; numbness on left side, slurred speech, and off balance. She took his vital signs and said they were good.  She stated that she did not believe that he was having a stroke and Dr. Richard Edde would not be in until 8:30am and to go lay down.  He went back to lay down.  After laying about an hour, he started feeling the symptoms all over again.  He had another stroke. He asked a friend, Charles Williams, to help him to medical due to him being unable to walk.  Williams got a wheelchair and pushed Plaintiff to medical. He reported the same symptoms to Dr. Edde again and the previous stroke episode that day. He was told per Dr. Edde that he didn't believe that he had these strokes.  The physician indicated he thought Plaintiff was trying to run a scam- *"if you are trying to run a scam you are doing a good job."* Plaintiff indicated that we were talking about his health and he could have died. He also indicated to him that his bowels before the strokes were black.  Dr. Edde told Plaintiff he was bleeding internally from taking ibuprofen that he prescribed for 90 days due to him having eight surgeries on his ingrown toe nails. Dr. Edde indicated he could not make any further recommendations. Dr. Edde stated he would send him to Lindsay Municipal Hospital and Plaintiff left 3 hours later with (c/o Morris). Sgt. Edward drove him to Lindsay and dropped him off.  Lindsay did the CT scan and Doctor Nermire came back and confirmed the two strokes. Dr. Nermire stated to Dr. Ellis, that he had referred him to OU Medical Center and Plaintiff discharged from Lindsay the next day. However, JDCC prevented the trip to OU and sent Plaintiff back to JDCC the next day. On 04/29/2016 around 6:30pm, Plaintiff had a brain aneurysm and was taken to the Emergency Room at the Muskogee Regional Medical Center and then transported to St. John's Hospital ICU in Tulsa for four days and remained there for three more days. Plaintiff was discharged on 05/06/2016 from the hospital and transported to JHCC around 6:30pm**.**

**(4)**    04/30/2016   St. John's Hospital Dr. Holsterweight & Dr. Gilbert confirmed he had 2 stokes/aneurysm.  The cause had not been determined so they were running tests. They confirmed with Dr. Ellis that he should have never been sent back to Jess Dunn without tests & cause.

11

**(5)**     05/02/2016     Dr. Ellis called to talk to Michelle, Sonya, the nurse, told her that Michelle was in a meeting. She reported to Dr. Ellis that Plaintiff had an abnormal gait, speech was back to normal, able to ambulate in room, stroke cause was still unknown, CT revealed brain bleed, and he is located in stroke unit. Dr. Ellis asked if it was possible for family to visit him in hospital. She indicated the Warden's office handles special visits to hospital. Their system allegedly went down so she could not tell me about his first visit.

**(6)**     05/04/2016     9:37 am     Rhonda indicated she could not give out information and she would call me back. I called back and Parsons indicated Dr. Edde was not available. Dr. Ellis was given to Michelle Lehnus number at Eddie Warrior. Michelle informed me that monitoring and testing for Plaintiff is beyond JDCC care. There was another CT given since last update, no evidence that intercranial bleeding is still occurring.

**(7)**     05/04/2016     3 p.m.     Michelle Lehnus provided update: CVA is stable and Rx for caregiver, OT & PT was prescribed.

**(8)**     05/05/2016     11:11am     Michelle Lehnus provided update: cerebral angiogram negative, will be discharged.

**F.     Joseph Harp Correctional Center JHCC Defendants**
P.O. Box 548, Lexington, OK 73051-0548

**Defendant, Robert Balogh, M.D**. and in his individual capacity;
**Defendant, Joel B. McCurdy, M.D.** and in his individual capacity;

The Plaintiff was transferred to Joseph Harp Correction Center (JHCC) because of the geriatric unit and to receive Physical Therapy, Occupational Therapy, and medical supervision. He has not received Occupational Therapy to date. His Physical Therapy was postponed until they identify and alleviate the pain on his left side. The Plaintiff presents a high risk to stroke and vascular disease. The Plaintiff did not see a neurologist until nine months after multiple strokes. This is discussed below. See [Attachment 1]. The issues of ***deliberate indifference, and wanton negligence*** are persistent from each facility that the Plaintiff has been transferred.

**Defendant Robert Balogh, M.D**.

The Defendant Balogh, worked at the Joseph Harp Correction Center in Lexington, Oklahoma, at the time these allegations arose. Defendant Balogh or Defendant Joel B. McCurdy had sent the Plaintiff to be seen by Joshua Kershen, M.D., Board Certified in Neurology and Neuromuscular Medicine and Electromyography. The Plaintiff has become acquainted with Dr. Ellis that has repeatedly contacted these officials by email and telephonically[3]. After the visit with Dr. Kershen, Defendant Balogh did not follow the directives of Dr. Kershen. The Plaintiff addresses a systemic failure with DOC for failing to provide relevant documentary material when attempting to get medical care at an outside facility appointment.

Defendant Balogh was working at the prison after he disclosed that he had an addiction problem to the Oklahoma Bureau of Narcotics (OBN) upon renewal of his license to dispense medications. See link below[4]. There are several links provided that have been found to be safe with McAfee and Windows Defender. The OBN took action against Defendant Balogh in 2010 after this admission on an application to renew his narcotics registration with OBN, documents show. The order from OBN and link, shows that Balogh admitted in 2009 to being addicted to pain medications, and that he had been using cocaine "recreationally." Balogh, who works at Joseph Harp as a staff physician, also admitted to "diverting drugs of patients by requiring patients to bring all medications to an appointment," then taking "handfuls of the drugs for himself," the OBN Order stated. Additionally, he endeavored to obtain hydrocodone by getting prescriptions from multiple doctors at the hospital in which he worked. Balogh was fined $10,000.00 by the OBN and is currently practicing under five years' probation. This type of inadequate professional

---

[3] Defendant Joel B. McCurdy can be reached at 405-641-0708 for further comment.
[4] Complaint filed against Dr. Robert Balogh by the Oklahoma Bureau of Narcotics and Dangerous Drugs

competence greatly infringes upon his ability to practice medicine and provide constitutionally required treatment.

**Defendant Joel B. McCurdy M.D**[5].

Joel B. McCurdy, a medical doctor, is now Director of Medical Services for the ODOC overseeing the entire State's medical services. McCurdy, also has a history of substance abuse while working at Joseph Harp[6], tested positive for alcohol at least five times in 2005 and 2006, according to a complaint filed by the licensure board at the link below. The complaint shows that McCurdy was treated at a rehabilitation facility three times between 2001 and 2006. He lost his medical license in 2006 and didn't get it back until late 2009, when he began working for the State Corrections Department. McCurdy remains on indefinite probation, according to board records.

**Evidence from Joshua Kershen, M.D**.

The Plaintiff also has evidence dated January 23, 2017, from Joshua Kershen, M.D., Board Certified in Neurology and Neuromuscular Medicine and Electromyography. See [Attachment 1]. In this document from Dr. Kershen, he acknowledges that he saw the Plaintiff for the first time on January 4, 2017, with a lack of medical facts and data to form an expert opinion because DOC had not provided him with the Plaintiff's medical records. This caused a delay from January 4, 2017, to January 23, 2017, for Dr. Kershen to give an expert opinion and recommendations. However, after Dr. Kershen received the records from the ODOC, his opinion was clear that ODOC did not provide adequate care under any standard of care. While records indicated that the Plaintiff did in fact have a "stroke in his right basal ganglia, and there is no comment on blood at that time." [sic]. See [Attachment 1 at 1].

---

[5] Complaint filed against Dr. Joel McCurdy by the Oklahoma Medical Licensure Board
[6] See also a Complaint filed against Wendall Miles by the Oklahoma Medical Licensure Board that is a physician's assistant at JHCC.

The failure to also provide constitutionally adequate care was evidenced by the Defendant's failure to provide Dr. Kershen with the facts and data that would enable him to adequately evaluate and treat the Plaintiff effectively. Defendants Balogh or McCurdy had the Plaintiff transported to be evaluated, and did not provide Dr. Kershen with medical records and thus contributing further to a deliberate indifference. The ODOC engages in this specific scheme of not providing medical records at the time of the appointments for outside care. The delay in providing records, in a day of technology, is constitutionally inadequate. Dr. Kershen also opines that the care given to the Plaintiff at St. Johns Medical Center was constitutionally inadequate as the doctors there failed to recognize signs that were visible on tests that were conducted at that facility.  Dr. Kershen wrote:

> It looks like they did both a conventional angiogram and a CT angiogram. ***They didn't find anything***.  I have personally reviewed the CT scan of the brain done on 04/30/16 at Saint John's. It shows acute blood (more blood than prior) in the right basal ganglia and there is 30mc hypo density outlining the ICH in a way that makes me think that there is stroke underneath that. MRI from the same day is also personally reviewed. Again, there is acute blood but I think there are areas more medial to the ICH which are DWI bright and ADC dark, which is very compelling for an acute ischemic infarct with secondary hemorrhage

For Dr. Kershen to make this medical finding after the ODOC's repeated attempts at denying that Plaintiff had a stroke, greatly calls into question the adequate training of medical professionals employed in the ODOC. This was a deliberate indifference to serious medical needs. Further, the Plaintiff sets forth a list of facts and discusses exhaustion of remedies.

### *Joseph Harp Correction Center*

**(1)**   05/12/2016   Letter to Dr. McCurdy in regard to medical care after strokes (any correspondences that are omitted from the Martinez report will be supplied after the filing of the Special Report, which may entitle the Plaintiff to summary judgment).

(2)     05/17/2016   9:30am        Plaintiff saw Dr. Balogh for a physical. The physician indicated the aspirin had been discontinued.  When asked why, the physician stated that he wasn't supposed to be taking the medication to begin with. He had several strokes and could have bled to death. Plaintiff asked who prescribed the aspirin and the physician said he did not know and it should not be a concern because nothing happened to him from taking it. Plaintiff asked Dr. Balogh how he could not be concerned when talking about his health. Plaintiff could have bled to death from the aspirin! Plaintiff indicated that someone would be held accountable for their actions. The physician then called security and indicated that he was being combative. Security sat in the remainder of his medical visit.

(3)     05/17/2016     CCC orders had with meals to pod x 3 months; f/u ccc in 3 months; bp check once a week until 3 mo. f/u- never provided bp checks and meals to pod as directed.

(4)     05/18/2016     D. Pruitt sent a medical appointment notification for Plaintiff to complete insurance forms.

(5)     06/01/2016     Plaintiff completed RTS form for ODOC/JHCC to follow St. John's Medical directives.

(6)     06/02/2016 medical responds to Plaintiff's RTS stating he saw Balogh on 5/17 and is unable to override decision a provider makes.

(7)     06/03/2016 Letter from Dr. McCurdy.

(8)     06/06/2016     RTS JHCC about JDCC with details of stroke in regard to Teresa Ealum response. Received at JDCC Medical 6/10/16.

(9)     06/09/2016     Leslie Goodman gave Plaintiff Fine Motor Coordination Exercises.

(10)    06/13/2016     Plaintiff filed grievance 16-097 in regard to no OT services.

(11)    06/21/2016     Trisha (last name unknown), a medical staff member, had a conversation with Liz Surrat (Plaintiff's mother) who indicated doctor only ordered 6 PT visits.  Plaintiff had 3 of the 6.  He went for an appointment and was not scheduled.

(12)    06/23/2016     Michelle Lehnus indicating no disposition on RTS; RTS filed out of time per OP-090124.

(13)    06/30/2016     Plaintiff filed Grievance due to hospitalization. Discharged 05/06/2016.

16

**(14)**   06/30/2016     Plaintiff received response from Grievance 16-097 in regards to OT services.

**(15)**   07/21/2016     Grievance received 07/11/2016 #JDMG-16-03 denial based on OP-090124.

**(16)**   07/21/2016     Grievance received 07/11/2016 #JDMG-16-04 denial based on OP-090124.

**(17)**   08/05/2016     Misconduct/Grievance Appeal to Administrative Review Authority sent to JDCC ordering a response in regard to Teresa Ealum, received 08/10/2016.

**(18)**   08/08/2016     Dr. Ellis asked for results from Plaintiff's OU Hospital visit.

**(19)**   09/09/2016     ODOC responded to 07/21/16 denial indicating improperly submitted grievance appeal stating inmate must submit inmate offender grievance form-hand written letter you wrote attached.

**(20)**   09/08/2016     MRI was given, (results should become part of the record).

**(21)**   10/21/2016     Carl Bear sends response to Grievance 16-152.

**(22)**   11/03/2016     Office of Management and Enterprise Services denied Tort Claim via certified mail. (The OMES did not send a release for medical information until being prompted by the Plaintiff).

**(23)**   12/13/2016     12:32 pm     Dr. Ellis spoke with Ms. Samples in regard to the Plaintiff's medical status; Asked what preventative care is being done for strokes, seizures/spasms, and nerve damage? She indicated they were renewing Flexeril. Dr. Ellis indicated that is used for muscle spasms not nerve damage and it is not relieving his pain; Are they tracking his BP when he is in pain? Is medical documenting his symptoms? Unable to answer my questions, but he can complete a sick call form. Dr. Ellis indicated that until they find the cause of strokes, Plaintiff must be monitored and preventative care should have started the day he left St. Johns Hospital.

**(24)**   12/22/2016     11:56 am     Dr. Ellis called medical and spoke to Ms. Pruitt. She indicated that she is unable to tell her when Plaintiff will have an appointment with a neurologist. Ms. Pruitt indicated Plaintiff saw a doctor on 11/28/2016 that documented Plaintiff was having pain in his shoulder and head, muscle spasms, and a decrease in muscle. Plaintiff was prescribed Naproxen Sodium and Flexeril. Dr. Ellis asked why Plaintiff was prescribed those drugs when he is having nerve pain not muscle pain or arthritis. Dr. Ellis stated that it is problematic that Rx are prescribed that have severe side effects and there is still no known cause for strokes or

17

aneurysm. Dr. Ellis requested he see a neurologist ASAP to remedy his pain and preventive measures should be taken to prevent another stroke.  Dr. Ellis emphasized that Plaintiff could have died and ODOC is not taking it seriously.

**(25)**   01/04/2017    Plaintiff was seen by Dr. Joshua C. Kershen (a neurologist) without any medical records. See [Attachment 1].

**(26)**   01/05/2017    Dr. Ellis sent an electronically transmitted correspondence to Director Allbaugh in regard to worsening medical condition.

**(27)**   01/08/2017    12:50 pm    Dr. Ellis spoke with Ms. Pruitt. Ms. Pruitt confirmed Plaintiff was seen by Dr. Kershen. CT scheduled for 01/09/2017 at ODOC. Dr. Ellis indicated her concern in regard to him going to a specialist for the first time since strokes and no medical records were sent with him is problematic.  Ms. Pruitt explained that there is a long wait for neurologist and a long wait for his next appointment due to shortage and many not having contracts with ODOC.  He will have an appointment at OU later.  She is printing off records for St. Johns so that Dr. Kershen can determine what tests were run.  Dr. Ellis requested a call back when testing completed, and interpretation by a specialist is provided, and Plaintiff is prescribed appropriate care.

**(28)**   01/10/1017    Plaintiff saw Dr. Moore asked about pain in his left side; Requested Rx for nerve pain until all tests were complete.

**(29)**   01/11/1017    10:08 a.m.    Ms. Pruitt received cat scan results.  She will follow up to confirm receipt, provide response time on Rx for pain, numbness, dizziness, etc., and when OT/PT can resume for Plaintiff.

**(30)**   01/17/2017    Dr. Ellis called Debbie Pruitt ext. 3433 to check on status on Rx, OT, PT: waiting on disk to see imaging himself from Lindsay.

**(31)**   01/23/2017    See Letter from Dr. Kershen in regard to January 4th appointment.

**(32)**   01/25/2017    Dr. Ellis called Debbie Pruitt to check on status on Rx, OT, PT.

**(33)**   01/31/2017    Plaintiff filed a RTS on newly discovered information from Dr. Kershen.

**(34)**   02/01/2017    Dr. Ellis spoke with Ms. Pruitt.  She sent a message to a nurse so that Balogh will see him early; She will make sure Plaintiff's records are sent to Dr. Kershen: Physician is only at JHCC on Mondays; she apologized because she was the only one there and they were understaffed.

18

Dr. Moore saw Plaintiff immediately after the phone call. Dr. Moore couldn't do anything. Plaintiff was informed that Balough wants to take care of everything; order for labs submitted.

**(35)**    02/02/2017    Release of Information done for Debra Hampton, the undersigned.

**(36)**    02/10/2017    RTS response indicating specific action requested is unknown.

**(37)**    02/16/2017    Plaintiff filed a grievance for newly discovered evidence on Jess Dunn #17-62.

**(38)**    02/20/2017    Plaintiff had appointment with Dr. Balough.

**(39)**    02/20/2017    Dr. Ellis sent a letter electronically to Director Allbaugh in regard to medical care.

**(40)**    02/24/2017    Mike McDougal sent response to grievance #17-62. Seen by Plaintiff on 2/27/17.

**(41)**    02/24/2017    Dr. Ellis sent certified letter to Director Allbaugh.

**(42)**    03/01/2017    Misconduct/Grievance Appeal to Administrative Review filed by Plaintiff in regard to newly discovered evidence.

**(43)**    04/11/2017    PA Richard Hutchinson.

**(44)**    4/13/17    Dr. Sami Ibrahimi at OU Medical Center appointment.

**(45)**    4/26/17    Dr. Timothy Mapstone MRI without contrast.

**(46)**    5/10/17    IHAP Completed by Sarah Givens, RN

**Jackie Branon Correctional Center**

**Defendant, Dr. J. Marlar**.
**Defendant, Jonna Perry.**
**Defendant, Sgt. Summers.**

The Plaintiff discusses the factual basis for his claims and his exhaustion of remedies below from the time he arrived at this facility. The Plaintiff also raises a First Amendment retaliation claim against Jonna Perry, as Perry had written a misconduct solely for retaliation purposes, and

Sgt. Summers, whose actions may have also been in violation of the First Amendment but reasonably believed to be because of racial discrimination in violation of the Fourteenth Amendment.

**(1)**    06/06/2017    Plaintiff submitted a job application for light duty and informed JBCC of current medical condition disclosing that he had three strokes and an aneurysm.

**(2)**    06/09/2017    Plaintiff was informed that he would be working in the kitchen at OSP Kitchen from 2am until 11am.

**(3)**    06/09/2017    Plaintiff was moved from Unit C to Unit A and was informed that he was not CCC eligible on C Unit.  Although Plaintiff advised that he was CCC eligible his C-Unit Case Manager, Mr. Harris, and Unit Manager, Ms. Palin, moved Plaintiff anyway.

**(4)**    06/10/2017    4:24p.m.    Dr. Ellis contacted Lt. Smith indicated Plaintiff arrived on 06/01/2017; no medical screening or review of medical jacket was done to date; family concerned about his assignment for job at OSP; Lt. Smith indicated it was against protocol for him to work without doing a medical screening; Dr. Ellis called back at 5:55pm and told Lt. Smith that Plaintiff is assigned at 2a.m. not 2p.m. as previously communicated; Lt. Smith indicated Plaintiff would have an extension until 06/26/2017.

**(5)**    06/13/2017    Ashley Smith, A - Unit Case Manager reassured Dr. Ellis that the CCC packet would be signed by Plaintiff and submitted that day.

**(7)**    06/13/2017    Crystal Shaffer sent an email to Jonna Perry stating that Dr. Marlar evaluated Plaintiff and he can do orderly work.

**(8)**    06/18/2017    Dr. Ellis sent letter to Director Allbaugh.

**(9)**    06/21/2017    9:37am    Dr. Ellis contacted medical after speaking with Plaintiff in regard to medical status and concern for his medical well-being.

**(10)**    06/22/2017    Release of Information for Elizabeth Surratt, Eisha Sykes, and Valeisha Ellis.

**(11)**    6/22/2017    Dr. Ellis sent letter to Director Allbaugh in follow up to conversation with Jerry Chrisman, Warden at JBCC; on the issue of Power of Attorney.

**(12)**    06/26/2017    Dr. Kershen's response to medical visit for EMG.

**(13)**   06/26/2017       Dr. Ellis sent letter to Director Allbaugh.

**(14)**   06/28/2017       Plaintiff filed RTS in regard to Sgt. David Summers.

**(15)**   06/30/2017       Warden forwarded RTS about Sgt. David Summers to OSP.

**(16)**   06/30/2017       RTS was filed in regard to Dr. Ellis 06/26/2017 Letter.

**(17)**   Date Unknown at 12:06pm    Dr. Ellis talked to Mallory Wooten in regard to Plaintiff's appointment; EMG done on left arm by Dr. Kershen, no documents or notes from Dr. Kershen received; asked why no documentation was sent? Why was a CT not done for medical episode that was documented at JBCC.  Dr. Kershen stated that he can only do what he is ordered to from ODOC.

**(18)**   Date Unknown at 1:09pm      Dr. Ellis talked to Mallory Wooten in regard to EMG appointment. Wooten read results from Dr. Kershen; indicated some of it she did not understand herself; indicated he would be seen at OU Medical Center within 60 days.

**(19)**   07/5/2017        IHAP form completed by Chris Kampas, RN and co-signed by Joel McCurdy, MD.

**(20)**   07/7/2017        Regina VanBlairicom indicates she is not sure what is he is asking for and if he needs to be seen for a medical condition or problem, complete sick call process.

**(21)**   07/7/2017        RTS to Regina VanBlairicom in regard to 06/26/2017 medical appointment notes from Dr. Kershen.

**(22)**   07/12/2017       Plaintiff filed Grievance 17-29 in regard to Sergeant Summers.

**(23)**   07/12/2017       Grievance 17-30 filed in regard to JBCC medical incident on and letter written by Dr. Ellis on 06/26/2017.

**(24)**   07/13/2017       Response to RTS for EMG results requesting Plaintiff send a disbursement.

**(25)**   07/25/2017       Warden denied grievance 17-29 because it requested disciplinary action against staff. (Sgt. Summers).

**(26)**   07/25/2017       Plaintiff filed Misconduct/Grievance Appeal to Administrative Review Authority in regard to Sgt. Summers.

**(27)**   07/26/2017   Grievance 17-30 unanswered because he did not indicate exactly how it should be handled on the RTS.

**(28)**   07/26/2017   Plaintiff filed a misconduct/grievance appeal to administrative authority in regard to 17-30.

**(29)**   07/31/2017   RTS form requesting EMG results from Dr. Kershen.

**(30)**   08/1/2017   Dr. Marlar prescribed Meloxicam to Plaintiff-see Rx label and documentation

**(31)**   08/3/2017   Regina VanBlairicom responds to RTS stating the notes have been sent to Plaintiff.

**(32)**   08/20/2017   Medication renewal for Meloxicam.

**(33)**   08/22/2017   11:26am   Dr. Ellis contacted the LT on duty and spoke to Lt. Williamson about the job issue he responded "I can't discuss anything with you. Jonna Perry is unavailable".  Dr. Ellis called JBCC back and asked for Jonna Perry and there was no answer: Sgt. Parker moved to OSP.

**(34)**   08/22/2017   Sgt. Brojo requested for Plaintiff to work 2-10pm on microwaves and phones; Jonna Perry refused to allow job Sgt. to hire Plaintiff; Job change form was signed by Brojo.

**(35)**   08/22/2017   RTS in regard to Jonna Perry firing the Plaintiff.

**(36)**   08/22/2017   RTS to Mordecia in regard to working.

**(37)**   08/23/2017   Plaintiff was notified that Jonna Perry terminated him; Sgt DeGraffinreid told Plaintiff if he didn't accept cleaning supply room 6a-2p.m. that he would put him on yard crew; Plaintiff asked if there were any other openings? Saxton sent Plaintiff to Lt Robinson at central office and reminded Plaintiff he had a packet in for lower security-Plaintiff didn't want to prolong his stay at JBCC.

**(38)**   08/28/2017   Response to RTS requesting Plaintiff address issue with your unit team.

**(39)**   08/30/2017   RTS filed to Jonna Perry.

**(40)**   08/30/2017   RTS filed to Dr. Marlar-responded to with no date in regard to will schedule for further evaluation.

**(41)**   09/01/2017   RTS to Deputy Mordecai.

22

**(42)**     09/05/2017     Response to RTS from Mordecai stating only one issue or incident allowed per form.

**(43)**     09/06/2017     Grievance 17-34 filed in regard to falsified information.

**(44)**     09/07/2017     RTS filed in regard to Jonna Perry in regard to why are you not working?

**(45)**     09/07/2017     Grievance 17-35 in regard to Dr. Marlar.

**(46)**     09/11/2017     RTS filed in regard to Regina VanBlaricom #0293 CD-7.

**(47)**     09/11/2017     RTS denied by Jonna Perry stating form must be specific and must be submitted within 7 days of the incident, with only one incident allowed per form.

**(48)**     09/10/2017     Grievance filed in regard to Regina VanBlaricom.

**(49)**     09/11/2017     Grievance filed to Regina VanBlaricom in regard to 6/26/17 letter from Dr. Kershen.

**(50)**     09/12/2017     Deputy Warden responds to RTS on Jonna Perry stating the issue was addressed.  You have been moved from A Unit to C Unit.

**(51)**     09/12/2017     Misconduct Disciplinary Decision made with punishment imposed 60 days PR-AD-1/60 days CR-AE-1.

**(52)**     09/13/2017     Warden denies relief for Grievance 17-34 stating disciplinary action against staff will not be addressed in grievance process.

**(53)**     09/18/2017     Grievance 17-36 denied no staff response on RTS; grievance submitted prior to RTS.

**(54)**     09/18/2017     Dr. Ellis sent letter to Director Allbaugh.

**(55)**     09/19/2017     Misconduct/Grievance Appeal to Administrative Review Authority on Grievance 17-34.

**(56)**     09/19/2017     RTS to Warden in regard to Summers approaching Plaintiff in the cafeteria.

**(57)**     09/19/2017     Misconduct/Grievance Appeal to Administrative Review Authority for 17-36 filed.

**(58)**     09/20/2017     Grievance 17-38 filed in regard to Jonna Perry.

**(59)**   09/20/2017      Dr. Marlar contacted Dr. Ellis, as Dr. Ellis is a relevant witness.

**(60)**   09/21/2017      RTS response from Warden indicated Unit Manager Todd Welsh and Chief of Security reviewed the surveillance and there were no actions to substantiate described above.

**(61)**   09/21/2017      Plaintiff filed offender's misconduct appeal form.

**(62)**   09/21/2017      Grievance 17-35 in regard to IHAP changes and falsified information from Dr. Marlar stating he was assessed on 09/12/2017 and was assessed with no restrictions (SEE IHAP DATES and LETTER to MARLAR from Dr. Ellis for evidence of falsification).

**(63)**   09/22/2017      Dr. Ellis wrote a letter to Dr. Marlar documenting conversation on 09/20/2017.

**(64)**   09/25/2015      Misconduct/Grievance Appeal to Administrative Authority filed in regard to IHAP and Dr. Marlar on Grievance 17-35.

**(65)**   09/27/2017      OU Medical Appointment ODOC prescribed Plaintiff a deadly drug called Meloxicam and McCurdy denies it in letter; OU states it should have never been prescribed. (Indicating yet again another deliberate indifference).

**(66)**   09/29/2017      Grievance 17-39 filed in regard to Sgt. Summers.

**(67)**   10/03/2017      Plaintiff had an appointment with Dr. Marlar and Regina Vanblairicom.   Indicated Plaintiff is being discharged from neurologist. Recommended tens unit, NO PT, and Tylenol for nerve pain-although Dr. Desousa recommended tens unit, PT, nerve pain-muscle relaxer, and if pain continues referral to pain management.

**(68)**   10/05/2017      ODOC Authority asked Warden at JBCC to investigate.

**(69)**   10/10/2017      Grievance 17-39 Relief denied in regard to Sgt. Summers.

**(70)**   10/10/2017      Grievance 17-34 denied by Warden may resubmit within 10 days if errors corrected.

**(71)**   10/10/2017      Grievance 17-38 relief denied due to failure to clearly state action/relief sought.

**(72)**   10/10/2017      Grievance 17-36 Appeal denied because not submitted according to policy and grievance restriction warning indicated on response.

**(73)**   10/13/2017   Misconduct/Grievance Appeal to Administrative Review Authority filed in regard Sgt. Summers.

**(74)**   10/13/2017   Grievance 17-38-1 filed against Jonna Perry questioning the Plaintiff about "why are you not working"

**(75)**   10/13/2017   RTS filed in regard to Sgt. David Summers entering the unit where Plaintiff resides.

**(76)**   10/13/2017   Misconduct/Grievance Appeal to Administrative Review Authority filed in regard to Grievance 17-39.

**(77)**   10/16/2017   RTS to Terri Apala claim of 9 pts.

**(78)**   10/17/2017   Dr. Joel McCurdy sends written response to Dr. Ellis's letters dated 06/26/2017, 06/27/2017, and 09/18/2017. (These documents should be produced in the Special Report).

**(79)**   10/17/2017   RTS filed requesting 9/27/17 Notes from Drs. Mausamin and DeSousa be adhered to; Discontinue Meloxicam.

**(80)**   10/18/2017   Grievance Appeal for 17-35 denied and warning given in regard a grievance restriction.

**(81)**   10/19/2017   RTS response from Terri Apala stating if you feel you are incorrectly classified please see your unit team.

**(82)**   10/20/2017   Relief denied from ODOC Administrative Review Authority in regard to Sgt. Summers 17-39.

**(83)**   10/20/2017   Response to RTS requesting 09/27/17 Notes from Drs. Mausamin and DeSousa be adhered to; DC Meloxicam stating that Dr. Marlar addressed this issue on 10/03/2017.

**(84)**   10/20/2017   RTS to Kim Lyn, Warden's assistant in regard to RTS 0293 non-response.

**(85)**   10/23/2017   RTS response from Lyn states she followed up with Regina and a nonresponse issue is being currently addressed through grievance 17-36.

**(86)**   10/23/2017   Response to Grievance 17-36 returned unanswered stating form not completed correctly, lacked details, and how inmate was affected.

**(87)**   10/23/2017     RTS response to adhering to Dr. Kershen orders on 06/26/2017 stating if you are having issues and need to be seen for a medical condition or problem please follow a sick call process.

**(88)**   10/23/2017     New Arrival/Adjustment review/Earned Credit Level completed by Jennifer Hensley and signed by Plaintiff documenting 8 security points.

**(89)**   10/24/2017     RTS response from Warden indicating Sgt. Summers did not address Plaintiff.

**(90)**   10/26/2017     Grievance 17-42 filed in regards to RTS on Sgt. Summers on 10/24/2017.

**(91)**   10/26/2017     Plaintiff received denial for Grievance 17-38-1.

**(92)**   10/26/2017     Grievance 17-45 filed in regard to RTS #0384-cd-7 requesting 9/27/2017 Notes from Drs. Mausamin and DeSousa be adhered to; Discontinue Meloxican

**(93)**   10/30/2017     Grievance 17-43 filed.

**(94)**   11/07/2017     Relief denied for 17-42 stating it was already addressed.

**(95)**   11/09/2017     RTS in regard to altered move to CCC to Natalie Gibson.

**(96)**   11/13/2017     Received TENS Unit (19 months after documented strokes and pain in left side)-no replacement batteries or electrode pads provided with unit for when the current supplies expire in the unit.

**(97)**   11/14/2017     Response to RTS on altered move stating eligible for CCC at 760 days remaining.

**(98)**   11/14/2017     Grievance for altered move sent about Terri Apala filed to Jerry Chrisman.

**(99)**   11/14/2017     Grievance 17-43 to Natalie Gibson denied by Jerry Chrisman stating unit manager Todd Walsh has reviewed file with Plaintiff and confirmed that the information is correct.

**(100)**   11/15/2017     Filed Misconduct/Grievance Appeal to Administrative Review Authority in regard to Grievance 17-42.

**(101)**   11/15/2017     Partial Relief granted for Grievance 17-45 from Regina VanBlairicom.

**(102)**   11/16/2017     Misconduct/Grievance Appeal to Administrative Review Authority filed for Grievance 17-45.

**(103)**   12/04/2017     Battery went out on tens unit.

**(104)**   12/4/2017     9:59am     Dr. Ellis contacted medical in regard to electrode pads and battery for tens unit. Summer indicated they received sick call form on 12/29/2017 when he comes to appointment tomorrow bring entire tens unit so that he can address issue with the doctor. Dr. Ellis inquired about have ongoing Rx for supplies so that Plaintiff can effectively use tens unit for pain.

**(105)**   12/06/2017     Plaintiff indicated doctor was not present; new battery provided; still no electrode pads-they were not ordered at the time of his appointment.

**(106)**   12/07/2017     ROI form sent to OU Medical Center with Power of Attorney copy attached.

**(107)**   12/07/2017     Dr. Ellis spoke to Natalie Gibson at 1:17pm in regard to correspondence sent last week to her and Director Allbaugh; Gibson stated you haven't received a response? Dr. Ellis responded no; she requested my name and number and stated Justin HySmith would contact Dr. Ellis in regards to a response. (4055275676).

**(108)**   12/07/2017     1:28 pm     Justin HySmith contacted Dr. Ellis he indicated that he has not forgot about her. He just started 4 days ago and is fully investigating the policies in regard to the matter (He worked for ODOC for 15 years, 7 years ago). Dr. Ellis asked if he looked at the new or old policies and he responded both.  He has been reading stacks of paper since he started including Plaintiff's case.  Dr. Ellis stated her letter was 8 pages long, and Plaintiff has had 3-unit managers, 3 case managers, and multiple administrators documents and forms related to this case. Of course, So you have a lot to review, and I hope my letter was clear for you to make a decision. HySmith responded it is very clear.  I have to review and see where my staff has confused or misunderstood policies. His direct number is 405.527.5676 ext. 2325.

*OPS Sergeant David Summers*

While the Plaintiff was inside the Oklahoma State Penitentiary he asked to use the restroom repeatedly.  The OSP officers on duty ***were laughing, mocking, and delaying obtaining the keys "stating they don't have the keys"*** so that Plaintiff could use the restroom. This continued long

enough for Plaintiff to urinate on himself.  Plaintiff sat down momentarily to wait for the bathroom, while the officer found his keys to the restroom, because he felt like he may have another stroke or seizure. Sgt. Summers walked up to Plaintiff, in a threatening and intimidating way, and stated…. "if another sergeant were here, we would whoop your ass for pissing on the floor." Plaintiff apologized and indicated that it was not deliberate, and offered to clean it up.

This would appear to be totally retaliatory and based upon racial discrimination. One can only assume that the exact issues that were addressed in *Battle v. Anderson*, 564 F. 2d 388, 398, (10th Cir. 1977) still persist to date. The entire action in *Battles* arose at this very institution OSP. When we discuss the actions of officers within the State ODOC and at OSP. A man was found burned to death in his cell, and gasoline used as an accelerant in this maximum-security institution. The investigation revealed the negligence of several employees and several were terminated because of the negligence and willful acts of said employees.

On this date, Lt. Parker sent Plaintiff back to his unit and requested that Plaintiff go to medical. Plaintiff's blood pressure (BP) was elevated higher than his personal average BP. Medical staff tried to force Plaintiff to sign a waiver stating that he was refusing to work.  Plaintiff declined to sign because he was not refusing to work.  The Plaintiff was attempting to follow doctors' orders and work "light-duty", as documented (i.e. no heavy lifting, standing for long periods of time, extreme/fast movements). Despite repeated complaints, litigation, and numerous inmate deaths, ODOC continues to willfully ignore the medical needs of inmates, not only the Plaintiff.

The chronic and severe neurological pain that Plaintiff is suffering is well documented. JBCC's failure to respond to Plaintiff's medical needs, and directives from the neurologists are a blatant showing of a deliberate indifference for abandoning appropriate care and rising to the level

of Eighth and Fourteenth Amendment violations. The failure to provide adequate medical care is putting Plaintiff's life in jeopardy.

On January 23, 2017, the Plaintiff saw a neurologist, Dr. Joshua Kershen and he provided a directive to the ODOC that it did not implement. The Defendants also ignore the directives given by Oklahoma University Medical Physicians. This will be ascertained by the medical records submitted in the Martinez report.

**ADDITIONAL EIGHTH AMENDMENT VIOLATIONS**

**PRISON OVER CROWDING, INADEQUATE STAFFING**

In the instant action, the Plaintiff has endured an Eighth Amendment violation. A subjective approach to deliberate indifference does not require a prisoner seeking "a remedy for unsafe conditions [to] await a tragic event [such as an] actual assault before obtaining relief." *Helling v. McKinney*, 509 U.S. 25, 33, 34-35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). A prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate. To establish that such exposure violates the Eighth Amendment, however, the conditions presenting the risk must be "sure or very likely to cause serious illness and needless suffering," and give rise to "sufficiently imminent dangers." *Helling v. McKinney*, *supra*.

The Court has explained that to prevail on such a claim there must be a **"substantial risk of serious harm,"** an **"objectively intolerable risk of harm"** that prevents prison officials from pleading that they were "subjectively blameless for purposes of the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 842, 846, and n. 9, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). See *Savage v. Fallin*, No. 16-6083. (10th Cir. 2016) the Court held:

> We reach the opposite conclusion as to Warden Bryant and DOC Director Patton. Savage cited statements made by Patton noting that **prison understaffing** has created dangerous situations in Oklahoma. He also claims that Patton personally made the decision to transfer inmates from county jails to DOC custody, causing overcrowding at JCCC. As to Bryant, Savage alleges that he has failed to

appropriately discipline inmates and cites to public statements from the previous JCCC warden decrying understaffing at the facility. See *Farmer*, 511 U.S. at 842 (subjective element may be satisfied by showing that problems were "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past"). Given that **deliberate indifference** may be demonstrated through "circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," *Id*. We conclude Savage has satisfied his initial pleading burden as to the subjective prong.

"No static test can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (quotation omitted). The Constitution "does not mandate comfortable prisons," *Rhodes* at 349, but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling*, 509 U.S. at 31.

The Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates," *Hudson v. Palmer*, 468 U.S. 517, 526-527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). See *Helling v. McKinney*, 509 U.S. 25, 33, 34-35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *Washington v. Harper*, 494 U.S. 210, 225, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); Estelle, 429 U.S., at 103. Cf. *DeShaney v.Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 198-199, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Further, having stripped offenders of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. Cf. *DeShaney*, *supra*, at 199-200; Estelle, *supra*, at 103-104. In the instant action the defendants showed a deliberate indifference to the Plaintiff's serious medical needs and increasing a substantial likelihood of the Plaintiff having another stroke.

There is no doubt that the overcrowding increases the incidents of both infectious communicable diseases (e. g., flu, hepatitis, tuberculosis, etc.,) and stress related diseases (e. g., rashes, asthma, hypertension, etc.). It is a harsh thing to say that the lives and health of inmates must be sacrificed to the administrative convenience of the defendants. *Battle v. Anderson*, 564 F. 2d 388, 398, (10th Cir. 1977). In *Battle* at 401, the Court held that the Trial Court's finding that the overcrowding inmate population at the two subject Oklahoma institutions constitutes cruel and unusual punishment proscribed under the Eighth Amendment to the United States Constitution, is supported by substantial evidence. See *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)

The issues with overcrowding create a financial burden on the State of Oklahoma which also affects inmate medical care all the way to providing adequate nutritional diets. The ODOC's budget for this physical year is the highest that it has ever been in the State's history. The ODOC Director Allbaugh has repeatedly voiced his concerns about the overcrowded prisons. It is no surprise that the capacity of the ODOC is reported at 113%[7]. In a recent publication based upon percentage, per capita, Oklahoma was at number 2 for incarceration, while remaining number 1 of incarceration of women. There are bigger constitutional issues that contribute to overcrowding in the State's prisons.

The ODOC enters into contracts with County jails to hold offenders after sentencing and also for delaying transfers to prisons. Understanding why Patton removed all the inmates from county jails as argued by Savage is also very important to the Eighth Amendment. Those contracts are unconstitutional as it creates an incentive for counties to incarcerate more people which

---

[7] Feb 5, 2018 - OKLAHOMA CITY – Corrections Director Joe M. Allbaugh applauded Gov. Mary Fallin's State of the State Address on ... "At DOC, we deal with reality, not fantasy. And the reality is the state is failing by ... and little support for reentry programs. "This morning, our state prisons were at 113 percent of capacity". http://doc.ok.gov/odoc-director-allbaugh-responds-to-governors-state-of-the-state-address

increases their funding which substantially impacts the State's budget for prison funding. Patton removed the inmates from the jails as the counties could not adequately provide for inmates' basic needs, with Patton claiming that these counties were violating contractual agreements with DOC. Those terms of the contracts were to protect the constitutional rights of the offenders which Patton obviously found that those rights were being violated and attempted to resolve that issue the best way he knew how.

However, the issue persists that the Oklahoma Department of Corrections remains at levels exceeding the capacity allotted by law. These issues with overcrowding and inadequate staffing are not grievable issue and thus the DOC cannot plead any failure to exhaust on a prison overcrowding claim or any issues concerning staffing being inadequate. The Constitution is clear on the standards of medical care. The very issue at hand presents a prima facie showing of a deliberate indifference by State officials.

**Relief Requested**

The Plaintiff is seeking damages from the officials in their individual capacities, and prospective relief in the official capacity claims, punitive and compensatory damages. The Plaintiff demands in excess of $5,000,000.00, plus reasonable attorney fees, and all costs that are associated with this action. The Plaintiff also requests that the State release him from custody so that he can provide for his own medical care as his sentence also violates the double jeopardy clause as later determined by the Oklahoma Court of Criminal Appeals.

The Plaintiff asserts that a United States Agency should intervene as a party in this action. To ensure the correct standards of care are implemented for offenders and to prevent unwarranted deaths. The Plaintiff has demonstrated a substantial showing that he is entitled to judgment as a matter of law.

**Exhaustion of Administrative Remedies Administrative Procedures**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

The Petitioner has demonstrated that he has exhausted his administrative remedies to these individuals, even filing a complaint under the Oklahoma Governmental Tort Claims Act 51 O.S. § 151 et seq. with the office of Risk Management. That office responded while never asking for a release of medical information and the Plaintiff had to specifically inquire as to why the Office did not. Any State law remedies at that point become inadequate to correctly address the federal constitutional violations. The Plaintiff argued that the employees' actions amounted to constitutional violations under the United States Constitution and the Oklahoma Constitution. Administrative remedies seem to be futile as even the office of Risk Management showed bad faith by not requesting a release of medical information. The Defendants should provide documented evidence of the exhaustion with the Martinez report.

## III.    CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully Submitted,

/s/ *DEBRA K. HAMPTON*

DEBRA K. HAMPTON, OBA # 13621
3126 S. Blvd., # 304
Edmond, OK 73013
hamptonlaw@cox.net
(405) 250-0966
(866) 251-4898 (fax)
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of March, 2018, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Office of the Attorney General
fhc.docket@oag.state.ok.us

/s/ *DEBRA K. HAMPTON*

DEBRA K. HAMPTON